UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DAVID E. MANN & VERA D. MANN,<br><br>Plaintiffs,<br><br>v.<br><br>CONSTANT OTTRO BAHI, et al.,<br><br>Defendants. | Civil Action No. 16-949 (JDB) |

**MEMORANDUM OPINION**

Drs. David Mann and Vera Mann are an elderly couple who claim they were swindled and robbed by the nurses they had trusted to provide needed nursing care in their home. They hired these health care professionals—Constant Ottro Bahi, Marie Poteman, and Mariatu Sesay—through a company that provides a listing of licensed nurses, Tri-Cities Nurse Registry and Helpmates. The Manns bring multiple intentional and unintentional tort claims against the nurses and the company, and bring a Consumer Protection Procedures Act claim against the company. One of the nurses, Bahi, moves to dismiss Count V, intentional infliction of emotional distress, against him because he argues that the Manns have failed to state facts sufficient to support that claim. As explained below, the Court will deny Bahi's motion to dismiss Count V.

**BACKGROUND**

The following are the facts according to the plaintiffs' amended complaint. Drs. David E. Mann and Vera D. Mann "are an elderly married couple" who have lived in the District of Columbia for 30 years. Amend. Compl. [ECF No. 1-2] ¶ 1. Each plaintiff is referred to by his or her first name to avoid confusion. As of May 2016, they were both 91 years old. Id. ¶ 14. In February 2015, David underwent emergency surgery and spent several weeks in intensive care.

1

Id. ¶ 15.  Vera was unable to provide the nursing care that David would need upon returning home, so they sought to hire qualified medical professionals to provide that care at their home.  Id.

Tri-Cities Nurse Registry and Helpmates, Inc., doing business as Capital City Nurses, provides two options for nursing care.  See id. ¶ 18.  Customers may directly hire Licensed Practical Nurses who are employed by the company.  Id. ¶ 19.  This service is known as "Capital City Nurses Healthcare Services."  Id.  Alternatively, customers may hire "qualified, independent caregiver[s]" through its referral service, known as Capital City Nurses Registry.  Id. ¶ 20 (internal quotations omitted).

Ultimately, the Manns' son hired "two primary caregivers" for Vera and David through the referral service, Capital City Nurses Registry: Constant Ottro Bahi and Marie Poteman.  Id. ¶ 21.  Beginning in "late March 2015," Bahi worked as plaintiffs' daytime caregiver, from approximately 7 a.m. to 7 p.m., and Poteman worked as the nighttime caregiver, from approximately 7 p.m. to 7 a.m.  Id.  When Bahi or Poteman were unavailable, Capital City Nurses Registry provided substitute caregivers, one of whom was Mariatu Sesay.  Id. ¶ 22.  Generally, the Manns were alone in their home with Bahi, Poteman, or Sesay; occasionally, the Manns' housekeeper was there as well.

Over the next several months, the Manns noticed that several items had gone missing from their home, and observed Bahi, Poteman, and Sesay engaged in a variety of suspicious behaviors.  There is no need to recount all of the allegations here, but a few will set the scene.  For example, Vera noticed that "small kitchen items" had gone missing, but thought they were merely displaced until she observed Poteman carrying some place settings upstairs, after which the items were not seen again.  Id. ¶¶ 26, 28.  Vera also noticed Poteman carrying packages to her car at a time when there was no reason to be doing so.  Id. ¶ 29.  At one time, once the Manns suspected the thefts,

David "nailed boards across some of the kitchen cupboards" and in response, Poteman ceased speaking to David, and then ceased coming to work entirely a few days later. Id. ¶ 30. Vera also noticed Bahi wandering through portions of the house that were behind locked doors and that Bahi was not meant to enter. Id. ¶ 31. She also encountered Bahi in David's office (which was locked) standing in front of open files. Id. ¶ 33. And around the same time that she noticed that items from her house were missing, she observed Bahi carrying large briefcases to his car with no explanation. Id. ¶ 34. Vera also believed that on August 23, 2015, Sesay stole a silver platter. Id. ¶ 35. Vera and Sesay had been sitting in the room where the platter was displayed, Vera stepped out for a moment, and then when she returned, the platter was gone. Id. Vera reported the theft to Capital City Nurses Registry, but the company took no further action. Id. ¶ 36. When Sesay was later assigned to cover a shift at the Manns' residence, the plaintiffs refused to admit her to their house. Id. ¶ 37.

More relevant to the immediate issues raised in this motion, at one point Vera "became so concerned" with Bahi's "roaming" through locked portions of the house, that "she packed her most valuable possessions in boxes and cartons and moved them to her third-floor bedroom, which she thought was secure behind the second floor locked passageway and her own locked bedroom entrance door." Id. ¶ 38. Some days later, on September 7 or 8, she awoke at approximately 2 a.m. to find Bahi in her bedroom, visible in the low light that Vera always kept on. Id. ¶ 39. Vera "recognized him" from the back "immediately" and "stayed in bed silently watching him from under her blanket." Id. "She saw his face plainly when he turned. Knowing that [David] was sleeping on another floor, she remained quiet and motionless." Id. She observed Bahi "rummaging through the cartons of her belongings" and ultimately removing "some boxes" and "extracting valuables," such as jewelry, from others. Id.

After this incident, Vera confronted Bahi.  Id. ¶ 40.  While he neither admitted nor denied taking the items, he allegedly responded by talking "at length about his faith in God" and telling Vera "how she would have a revelation and be rewarded in the Kingdom of Heaven for the good that her property would do in the hands of others."  Id.

Approximately 10 days after this strange encounter, the Manns discovered that a locked closet had been forced open, and "the contents of the closets [sic] ransacked."  Id. ¶ 41.  Multiple valuable fur coats were missing, as were sterling silver objects.  Id. ¶ 45, 48.  At this point, the Manns phoned the police.  Bahi did not show up to work that day, nor did he return anytime afterwards.  Id. ¶¶ 41–42.  Vera and David then filed this lawsuit in D.C. Superior Court in April 2016, and filed an Amended Complaint in May 2016.  Defendants removed the suit to federal court on the basis of diversity jurisdiction.  See Notice of Removal [ECF No. 1] at 1; 28 U.S.C. §§ 1441, 1446, 1332.[1]  The complaint alleges twelve counts, five of which are against Bahi: (i) conversion, (ii) trespass to chattels, (iii) trespass, (iv) intrusion upon seclusion, and (v) intentional infliction of emotional distress (IIED).  Bahi now brings this motion to dismiss regarding Count Five, arguing that even if the facts as alleged are true, his conduct does not amount to intentional infliction of emotional distress.

## **LEGAL STANDARD**

At the motion to dismiss stage, all of a plaintiff's factual allegations are taken as true.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  In order to survive a Rule 12(b)(6) motion to dismiss, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true."  Id. (internal citation omitted).  The complaint "must contain sufficient factual matter, accepted as true, to state

---

[1] As initially filed, the complaint named Capital Health Care Associates, Inc., as a defendant.  That defendant was voluntarily dismissed on May 26, 2016.  See Notice of Voluntary Dismissal [ECF No. 9].

a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

## DISCUSSION

Because this case comes to the Court through diversity jurisdiction, the District of Columbia's choice of law rules apply. See Mastro v. Potomac Elec. Power Co., 447 F.3d 843, 857 (D.C. Cir. 2006). The parties here agree that D.C. law applies. Under D.C. law, "[t]o succeed on a claim of intentional infliction of emotional distress, a plaintiff must show (1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." Armstrong v. Thompson, 80 A.3d 177, 189 (D.C. 2013) (internal quotation marks omitted). Generally, "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" that are simply "inconsiderate or unkind" are not sufficiently outrageous to support this claim. King v. Kidd, 640 A.2d 656, 668 (D.C. 1993) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)). Nor is it enough "that the defendant has acted with an intent which is tortious or even criminal." Armstrong, 80 A.3d at 189 (internal quotation marks and alterations omitted). Rather, "[t]he conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Id. (quoting Drejza v. Vaccaro, 650 A.2d 1308, 1312 n.10 (D.C. 1994) (quoting Restatement (Second) of Torts § 46 cmt. d (1965))). In the classic (if cartoonish) formulation, "[t]he ultimate question is whether the recitation of the facts to an average member of the community would arouse his [or her] resentment against the actor, and lead him [or her] to exclaim 'Outrageous!'" Purcell v. Thomas, 928 A.2d 669, 711 (D.C. 2007) (internal quotation marks omitted) (alterations original). The tortfeasor's

"[i]ntent or recklessness can be inferred from the outrageousness of the acts." Howard Univ. v. Best, 484 A.2d 958, 985 (D.C. 1984).

Bahi argues that even if the allegations are true, his conduct does not rise to the necessary level of outrageousness to support a claim for IIED. In support of this theory, he argues that property-related torts—such as those alleged here—can never rise to the level of justifying an IIED claim. He also contends that plaintiffs have failed to allege a sufficient injury because neither of them assert that they suffered physical harm as a result of their distress. Bahi's arguments are not persuasive.

Based on the allegations in the complaint, whether Bahi's actions were "extreme and outrageous" and whether they support an inference that he acted intentionally or recklessly, are factual questions for a jury. Whether "the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery . . . should be submitted to the jury if reasonable people could differ." Id. Here, based on the facts alleged in the complaint—taken as true at the motion to dismiss phase—reasonable people could disagree.

Bahi is simply incorrect that property-related torts can never support a claim for intentional infliction of emotional distress. To the contrary, D.C. law has recognized instances where harm to property gave rise to an IIED claim. See, e.g., Parker v. Stein, 557 A.2d 1319, 1322–23 (D.C. 1989) (IIED claim arising from landlord throwing away all of tenants' belongings "is predicated on allegedly intentional wrongdoing to [tenant's] property, and we see no reason to treat it differently from other suits for intentional torts"); Azzam v. Rightway Dev. Inc., 789 F. Supp. 2d 110, 118 (D.D.C. 2011) (IIED claim arising from destruction of house and its contents without notice); cf. Oliver v. Mustafa, 929 A.2d 873, 878–79 & nn.2–3 (D.C. 2007) (standard for punitive damages is similar to that of IIED, and improper eviction and removal of personal belongings is

sufficient for punitive damages).  This is consistent with the overall approach to IIED claims: the core inquiry is the outrageousness of the conduct and the distress it causes, rather than any specific type of conduct.

What constitutes outrageous conduct depends on the specific circumstances at issue.  For example, in an employment relationship, generally neither firing an employee without cause, see Howard Univ. v. Baten, 632 A.2d 389, 395 (D.C. 1993), nor a solitary instance of race discrimination, see Paul v. Howard Univ., 754 A.2d 297, 308 (D.C. 2000), will give rise to an IIED claim.  But a "pervasive discriminatory environment" will.  Burnett v. Am. Fed'n of Gov't Emps., 102 F. Supp. 3d 183, 190 (D.D.C. 2015).  In the context of interfering with a person's home and belongings, tearing down a fence between properties and trespassing on a neighbor's garden, as part of a long-standing dispute over an easement, is not sufficiently outrageous for an IIED claim. See Wood v. Neuman, 979 A.2d 64, 77–78 (D.C. 2009).  But removing all of a tenant's belongings and throwing them away without warning, Parker, 557 A.2d at 1322–23, or bulldozing a home and all the belongings inside, Azzam, 789 F. Supp. 2d at 118–19, are extreme enough that the question must go to the jury.  When it comes to insulting a plaintiff, sending factually accurate anonymous letters to the plaintiff's future employer about the plaintiff's past performance does not give rise to an IIED claim.  See Armstrong, 80 A.3d at 181–82, 189–90.  Likewise, sending a letter to the plaintiffs' neighbors accusing plaintiffs of writing a bad check is insufficient for an IIED claim. Weaver v. Grafio, 595 A.2d 983, 990–91 (D.C. 1991).

As is clear from these cases, context matters.  See King, 640 A.2d at 668; Burnett, 102 F. Supp. 3d at 190.  Indeed, the D.C. Court of Appeals has stated so explicitly, explaining that a court "must consider: (1) applicable contemporary community standards of offensiveness and decency, and (2) the specific context in which the conduct took place, for '[i]n determining whether conduct

is extreme or outrageous, it should not be considered in a sterile setting, detached from the surroundings in which it occurred.'" King, 640 A.2d at 668 (alteration original) (quoting Harris v. Jones, 380 A.2d 611, 615 (Md. 1977)).  The context "consists of" not only the "nature of the activity at issue" but also "the relation between the parties, and the particular environment in which the conduct took place." Id. (internal quotation marks omitted).  Relevant to this case, the relationship between the parties might make conduct that is otherwise merely offensive into conduct that is extreme and outrageous; thus "[c]ourts carefully scrutinize a defendant's conduct where the defendant is in a peculiar position to harass the plaintiff, and cause emotional distress." Id. (internal quotation marks omitted).  This is especially relevant when the tortfeasor has "'knowledge that the [victim] is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity.'" Id. (quoting Restatement (Second) of Torts § 46 cmt. f (1965)).  Courts have often taken notice of the parties' relationship, and how that contributes to the outrageousness of the conduct in that particular context.  See, e.g., id. at 669–71 (employer/employee); Jonathan Woodner Co. v. Breeden, 665 A.2d 929, 935 (D.C. 1995) (landlord/tenant).

Here, reasonable jurors could believe that Bahi's conduct—especially when viewed in the light of his relationship with the Manns—was outrageous and extreme.  Bahi had permission to enter the Manns' home, but that permission was implicitly conditioned on his agreement to not enter the locked areas of their home (and, it should go without saying, to not steal from the Manns). See Amend. Compl. ¶ 31.  He was in a particular position of trust given that he was responsible for providing medical care to David, whom Bahi knew was physically unable to care for himself. See id. ¶ 21.  Taking the allegations in the complaint as true, as the Court must at this stage, Bahi intruded into locked areas of the house on multiple occasions for the purpose of stealing property.

See id. ¶¶ 31–34. On one of those occasions, he entered Vera's locked bedroom in the middle of night, rummaged through her closet and belongings, and stole valuables. Id. ¶ 39. When Vera confronted him, he told her to be thankful that someone else would benefit from the stolen items. Id. ¶ 40. This behavior is brazen and bizarre, to say the least. For many, encountering an intruder in their bedroom at night would be terrifying. It would be particularly petrifying for someone in Vera's predicament: by her own account, she was physically frail and homebound, and therefore unable to flee, seek assistance, or resist (if needed) when encountering an intruder. See id. ¶ 52. Bahi was well aware of Vera's physical limitations—he had been hired precisely because she was unable to care for David, and he had spent months in Vera's company by the time the nighttime incident took place. Reasonable jurors could find that, in the context of a nurse hired to provide care for a frail and vulnerable elderly couple, breaking into a bedroom at night, stealing, and then telling the victim to be thankful for the theft, is beyond the bounds of decency in a civilized society.

Bahi also argues that the Manns' claim must fail because they have not alleged any physical harm resulting from their distress at Bahi's conduct. But D.C. law does not require that a plaintiff suffer physical harm as a result of his or her emotional distress. The D.C. Court of Appeals has addressed this misapprehension head on, explaining: "Our cases have long recognized that a plaintiff may recover damages for mental suffering unaccompanied by physical injury as part of his recovery for an intentional tort." Parker, 557 A.2d at 1322–23 (collecting cases); see also Burnett, 102 F. Supp. 3d at 190–91 (permitting recovery without physical injury).

It is true that the D.C. Court of Appeals has occasionally framed the second prong of the test as requiring "the plaintiff [to] demonstrate 'an intent on the part of the alleged tortfeasor to cause a disturbance in [the plaintiff's] emotional tranquility so acute that harmful physical consequences might result." Wood, 979 A.2d at 77 (second alteration original) (quoting Sterling

9

Mirror of Md., Inc. v. Gordon, 619 A.2d 64, 67 (D.C. 1993)). From this, Bahi argues that Vera Mann has not pleaded sufficient harm to sustain her claim of IIED. See Def.'s Mot. to Dismiss [ECF No. 10-1] at 8–9; Def.'s Reply [ECF No. 19] at 4; see also Wood, 979 A.2d at 78 ("crying," and feeling "shaken" and like a "pariah" in the neighborhood are not sufficient for IIED claim); Futrell v. Dep't of Labor Fed. Credit Union, 816 A.2d 793, 808 (D.C. 2003) ("mental anguish" and "stress" are not sufficient for IIED claim). But the analysis in Wood focused on how the mildness of the plaintiff's claimed harm indicated that the conduct in question was "quite underwhelming rather than outrageous." Wood, 979 A.2d at 78. And Futrell did not consider the issue of the plaintiff's physical harm at all, beyond reciting this formulation of the rule. Futrell, 816 A.2d at 808. Neither Futrell nor Wood, then, gives the Court any reason to believe that Parker's clear statement on the topic is no longer good law. Hence, the Court will follow Parker and reject Bahi's argument to the contrary.

## CONCLUSION

For the reasons explained above, plaintiffs have alleged sufficient facts to state a claim for intentional infliction of emotional distress. Whether the events occurred as plaintiffs allege, and whether Bahi's conduct is sufficiently outrageous for plaintiffs to prevail on that claim, are questions of fact that must be further developed through discovery, and ultimately decided by a jury. Bahi's motion to dismiss will therefore be denied. A separate order has been issued on this date.

/s/
JOHN D. BATES
United States District Judge

Dated: March 17, 2017