# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DAVID E. MANN & VERA D. MANN,

     Plaintiffs,

     v.

CONSTANT OTTRO BAHI, et al.,

     Defendants.

Civil Action No. 16-949 (JDB)

## MEMORANDUM OPINION

Drs. David Mann and Vera Mann are an elderly couple who claim they were brazenly robbed by their in-home nurses. Their son, James, hired professional nurses for them through Tri-Cities Nurses Registry and Helpmates, Inc. The Manns bring multiple tort claims against the nurses and Tri-Cities. They also bring a claim against Tri-Cities under the District of Columbia's Consumer Protection Procedures Act, alleging that Tri-Cities operated without the required license in the District of Columbia. The Manns and Tri-Cities now both move for summary judgment on that claim. As explained below, the Court will deny both motions.

## BACKGROUND

### I. Factual Background

The facts relevant to this claim are largely undisputed.[1] The summary that follows is based on undisputed facts except where noted. A more complete explanation of the facts can be found in this Court's March 17, 2017, Opinion. See Mem. Op., Mar. 17, 2017 [ECF No. 36].

Drs. David E. Mann and Vera D. Mann "are an elderly married couple" who have lived in the District of Columbia for 30 years. Am. Compl. [ECF No. 1-2] ¶ 1. Each plaintiff is referred

---

[1] The facts about the conduct of the individual defendants are disputed, but are not relevant here.

to by his or her first name to avoid confusion. As of December 2016, they were both 92 years old. J. Mann Decl. [ECF No. 29-12] ¶ 4. In February 2015, David underwent surgery and an extended hospital stay; their son James determined that David would need private nursing care during his stay in a rehabilitation facility and at home after returning from the hospital. Pls.' Stmt. of Undisputed Facts [ECF No. 29-2] ¶¶ 10, 15. James hired nurses to provide this care through Tri-Cities. See id. ¶ 14; J. Mann Decl. ¶¶ 4–7.

Tri-Cities Nurse Registry and Helpmates, Inc., doing business as Capital City Nurses, provides two options for nursing care. See Am. Compl. ¶ 18. Customers may hire Licensed Practical Nurses who are employed by the company. Id. ¶ 19. This service is known as "Capital City Nurses Healthcare Services." Id. Alternatively, customers may hire "qualified, independent caregiver[s]" through its referral service, known as Capital City Nurses Registry. Id. ¶ 20; Def.'s Stmt. of Undisputed Facts [ECF No. 31-2] ¶¶ 1–3. The nurses available through Tri-Cities' registry are all licensed and operate as independent contractors. Def.'s Stmt. of Undisputed Facts ¶¶ 2–4. The client pays those nurses directly, and also pays a referral fee to Tri-Cities for "each shift that a client accepts services from a referred caregiver." Id. ¶¶ 6–7.

James ultimately decided to use the referral service to hire two primary caregivers for Vera and David. Am. Compl. ¶ 21; J. Mann Decl. ¶ 7. He chose the referral service because it was "more economical" and would allow his parents "to independently accept or reject the caregivers" that the company referred. J. Mann Decl. ¶ 7. Tri-Cities communicated with James primarily through two letters, both dated February 16, 2015. The first letter explained the two types of services that the company provides; the second was described as a "Welcome Letter" and provided more information regarding the referral service. Id. ¶¶ 7–11. The first letter stated that Capital City Nurses Registry is a "Nursing Referral Service Agency" and that Capital City Nurses

Healthcare Services is a "Residential Service Agency." Ex. B [ECF No. 29-12] at 8. It did not define these terms, or explain that they referred to licenses from the Maryland Department of Health. The second letter, which contained information specific to Capital City Nurses Registry, stated that Tri-Cities was licensed in Maryland as a Nursing Referral Service Agency. Id. at 9. It also stated that "in accordance with State regulations, the State of Maryland has established a Nursing Referral Service Agency Hotline" and provided that phone number. Id. at 10. It did not mention any license in the District of Columbia. James was responsible for making all of the arrangements on behalf of David and Vera, and he paid Tri-Cities referral fees as well as the nurses' fees. Pls.' Stmt. of Undisputed Facts ¶ 14.

Beginning in March 2015, Constant Ottro Bahi and Marie Poteman were the Manns' primary daytime and nighttime caregivers, respectively. Am. Compl. ¶ 21. When Bahi or Poteman were unavailable, Tri-Cities referred substitute caregivers, one of whom was Mariatu Sesay. Id. ¶¶ 4, 22. Generally, the Manns were alone in their home with Bahi, Poteman, or Sesay. Id. ¶ 25.

Over the next several months, the Manns noticed several items had gone missing from their home, and noticed Bahi, Poteman, and Sesay acting suspiciously. See id. ¶¶ 26–49. According to the Manns, Vera also noticed Bahi entering portions of the house that were behind locked doors and that Bahi was not meant to enter. Id. ¶ 31. These suspected thefts are recounted in detail in the Court's prior opinion. See Mem. Op., Mar. 17, 2017, at 1–4. As Tri-Cities acknowledges, at one time Vera reported one of Sesay's suspected thefts to Tri-Cities. Am. Compl. ¶ 36; Answer [ECF No. 13] ¶ 36. According to the plaintiffs, Tri-Cities responded that they had not received any other complaints about Sesay, and took no further action. Am. Compl. ¶ 36. According to the Manns, when Sesay was later assigned to cover a shift at their residence, they did not permit her to enter the house. Id. ¶ 37.

## II.     Procedural and Statutory Background

Vera and David filed this lawsuit in the D.C. Superior Court in April 2016, and filed an Amended Complaint in May 2016. Defendants removed the suit to federal court on the basis of diversity jurisdiction. See Notice of Removal [ECF No. 1] at 1; 28 U.S.C. §§ 1441, 1446, 1332. In March 2017 this Court issued a Memorandum Opinion denying defendant Bahi's motion to dismiss one count against him. Now, the plaintiffs have filed a motion for partial summary judgment on count ten, the Consumer Protection Procedures Act ("CPPA" or "the Act") claim, and defendant Tri-Cities has filed a cross-motion for partial summary judgment on the same claim. See Pls.' Mot. for Partial Summ. J. [ECF No. 29]; Def.'s Cross-Mot. for Partial Summ. J. [ECF No. 31].

The Manns contend that Tri-Cities operated an unlicensed nurse staffing agency in the District of Columbia, and that it presented misleading information about its licensing status to James Mann, in violation of the CPPA. The merits of that claim stem from a difference in Maryland and D.C. laws requiring licenses for agencies providing nursing care. Maryland provides one license for agencies that employ home-care nurses, and another license for agencies that provide referrals to nurses who are independent contractors. See Md. Code § 19-4A (Residential Service Agencies); id. § 19-4B (Nursing Referral Service Agencies). The District of Columbia, on the other hand, requires a license for "nurse staffing agencies," which must employ their nurses, without specifying a different license for agencies that refer independent-contractor nurses. See D.C. Code §§ 44-1051.01–.18 (Nurse Staffing Agency Act). The Manns argue that D.C.'s licensing scheme only permits Tri-Cities to provide services by employed nurses; it does not permit an agency to provide referrals from independent-contractor nurses at all—and thus Tri-Cities operation of the Capital City Nurses Registry in D.C. violates the licensing statute.

The CPPA, in turn, forbids a variety of unlawful trade practices and "establishes an enforceable right to truthful information from merchants about consumer goods and services that are or would be purchased, leased, or received in the District of Columbia." See D.C. Code §§ 28-3901 to 28-3903 (CPPA); id. § 28-3901(c) (establishing enforceable right to truthful information). It defines a "trade practice" as "any act which does or would create, alter, repair, furnish, make available, provide information about, or, directly or indirectly, solicit or offer for or effectuate, a sale, lease or transfer, of consumer goods or services." Id. § 28-3901(a)(6). Section 28-3904 contains a nonexclusive list of unlawful trade practices. See Atwater v. D.C. Dep't of Consumer & Regulatory Affairs, 566 A.2d 462, 466 (D.C. 1989) (list is nonexclusive). It states that:

> It shall be a violation of this chapter, whether or not any consumer is in fact misled, deceived, or damaged thereby, for any person to:
> (a) represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have;
> (b) represent that the person has a sponsorship, approval, status, affiliation, certification, or connection that the person does not have;
> . . .
> (d) represent that goods or services are of particular standard, quality, grade, style, or model, if in fact they are of another;
> (e) misrepresent as to a material fact which has a tendency to mislead;
> (e-1) represent that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law;
> (f) fail to state a material fact if such failure tends to mislead;
> (f-1) use innuendo or ambiguity as to a material fact, which has a tendency to mislead;
> . . .
> (s) pass off goods or services as those of another.

D.C. Code § 28-3904. The CPPA also identifies several other D.C. statutes for which "violat[ing] any provision" of those statutes, or certain portions of those statutes, is an unlawful trade practice under the CPPA. See id. § 28-3904(y)–(hh). In addition to enabling the proper state agency to enforce its terms, the Act also creates a private cause of action: "A consumer may bring an action seeking relief from the use of a trade practice in violation of a law of the District." Id. § 28-

3905(k)(1)(A).  The CPPA instructs that it "shall be construed and applied liberally to promote its purpose," id. § 28-3901(c), and that one of its purposes is to "assure that a just mechanism exists to remedy all improper trade practices," id. § 28-3901(b)(1).

The Manns contend that Tri-Cities' action of offering its services in D.C., and its statement that it was licensed in Maryland, implied that it was licensed in D.C., when in fact it was not, and therefore was an unlawful trade practice in violation of § 28-3904(a), (b), (d), (e), (e-1), (f), (f-1), and (s) of the CPPA.  They seek $624,000 in statutory damages based on the statutory maximum of $1,500 for each referral that Tri-Cities provided, as well as attorney's fees and an injunction ordering Tri-Cities to cease operating an unlicensed nurse staffing agency.  Tri-Cities, on the other hand, responds that D.C.'s Nurse Staffing Agency Act simply does not apply to agencies that provide referrals, and thus it did not violate that act.  Because Tri-Cities accurately represented its Maryland licenses and was not required to obtain any D.C. license, it argues, it did not engage in an unlawful trade practice in violation of the CPPA.  Tri-Cities also maintains that plaintiffs lack standing and that even if it did violate the Nurse Staffing Agency Act, plaintiffs have no cause of action under the CPPA.  Finally, it argues that even if plaintiffs prevail, they are only entitled to $1,500 in damages.

The Court finds that David Mann has standing and a CPPA cause of action, and that there are genuine disputes of material facts as to whether Tri-Cities violated the CPPA.  The Court will therefore deny both motions for summary judgment.

## LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party who would bear the burden of proof at trial bears the same burden at summary judgment.  See

Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). In determining whether there exists a genuine dispute of material fact sufficient to preclude summary judgment, a court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A court may not "make credibility determinations or weigh the evidence." Lopez v. Council on American–Islamic Relations Action Network, Inc., 826 F.3d 492, 496 (D.C. Cir. 2016) (internal quotation marks omitted).

A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position. Anderson, 477 U.S. at 252. Moreover, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249–50 (internal citations omitted). Summary judgment, then, is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]." Id. at 252. In evaluating cross-motions for summary judgment, "[t]he general standards for summary judgment do not change": the court must "construe all facts and inferences therefrom in favor of the party against whom the motion under consideration is made." Calumet River Fleeting, Inc. v. Int'l Union of Operating Eng'rs., Local 150, AFL–CIO, 824 F.3d 645, 647–48 (7th Cir. 2016) (internal quotation marks omitted).

## DISCUSSION

### I.    David Mann Has Standing

The "'irreducible constitutional minimum' of standing consists of three elements. The plaintiff must have suffered (1) an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016) (quoting Lujan v. Defenders of Wildlife, 504

U.S. 555, 560 (1992)) (internal citations omitted).  The injury in fact must be both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."  <u>Lujan</u>, 504 U.S. at 560.  Only one party must have standing to satisfy Article III's requirements.  <u>See</u> <u>Rumsfeld v. Forum for Academic and Institutional Rights, Inc.</u>, 547 U.S. 47, 52 n.2 (2006).

Tri-Cities argues that David does not have standing to bring this claim because he never purchased services from Tri-Cities—rather, his son James did—and therefore David was not misled and did not suffer an injury.  The Manns respond that the CPPA covers "consumers" in addition to "purchasers," and therefore the company violated the act even if no one was misled.  The parties' arguments have tangled up the various elements of standing, and have confused the issue of constitutional standing with the question of who has a cause of action under the Act.  Nonetheless, the Court finds that David has standing to pursue his CPPA claim against Tri-Cities.

Although it might violate the CPPA to present misleading information even if no one was misled, a private plaintiff cannot bring a suit in federal court to enforce that claim unless he or she has suffered an injury in fact.  <u>See</u> <u>Spokeo</u>, 136 S. Ct. at 1548.  While Congress, or in this case the District of Columbia, may "'define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before,'" a plaintiff must still suffer a concrete and particularized injury to satisfy the requirements of Article III.  <u>Id.</u> at 1549 (quoting <u>Lujan</u>, 504 U.S. at 580 (Kennedy, J., concurring in part)).  D.C. law is clear that the CPPA is meant to extend as far as Article III's requirements will permit—but it can go no further than that.  <u>See</u> <u>Floyd v. Bank of Am. Corp.</u>, 70 A.3d 246, 251–52 (D.C. 2013).  Thus, if David had only alleged that Tri-Cities violated the CPPA without also alleging that he was misled or that he suffered any harm, that would not be sufficient.  <u>See</u> <u>Hancock v. Urban Outfitters, Inc.</u>, 830 F.3d 511, 514 (D.C. Cir. 2016) (finding two customers had no standing against merchant who asked for their zip codes when

making a sale in violation of the Act because customers alleged no harm); <u>see also</u> <u>Meyers v.</u> <u>Nicolet Restaurant of De Pere, LLC</u>, 843 F.3d 724, 728 (7th Cir. 2016) (similar).

But David has alleged that he suffered actual harm. He claims that his agent—James, who the parties do not dispute was acting on David's behalf—was actually misled by Tri-Cities' misrepresentations and omissions. <u>See</u> J. Mann Decl. ¶ 15 ("I would not have selected the Registry for my father had I known in February 2015 that it was required to be, but was not, licensed by the D.C. Department of Health"). As a result, David received care from a merchant whose services he would not have otherwise received, had James not been misled. David further claims that he suffered additional injury in the form of allegedly sub-par care provided by the nurses who Tri-Cities referred. Hence, he has alleged actual injury-in-fact, even if that injury was not that he <u>himself</u> was misled. This is sufficient for Article III standing.

Tri-Cities' core argument seems to be one of traceability, not injury in fact—that is, that David cannot take advantage of the CPPA because he himself did not purchase any services from Tri-Cities. Leaving aside the question whether James' actions as his father's agent could be attributed to David, for the issue of <u>standing</u>, the traceability requirement of Article III does not require that the defendant's actions be "the very last step in a chain of causation" leading to the plaintiff's injury. <u>See</u> <u>Bennet v. Spear</u>, 520 U.S. 154, 169 (1997); <u>cf.</u> <u>Lexmark Int'l, Inc. v. Static</u> <u>Control Components, Inc.</u>, 134 S. Ct. 1377, 1386–1391 (2014) (distinguishing proximate-cause test for determining plaintiffs authorized to sue by statute from Article III standing). Rather, it is enough that the injury be "fairly traceable to the challenged conduct of the defendant." <u>See</u> <u>Spokeo</u>, 136 S. Ct. at 1547–48. As to whether the CPPA protects David although he never directly purchased any services from Tri-Cities, that is a question of statutory interpretation, not of Article III standing. <u>See</u> <u>Lexmark</u>, 134 S. Ct. at 1387–88. That question is analyzed below.

**II.    The Act Creates a Private Right of Action**

**A.  The Act Protects "Consumers" As Well As "Purchasers"**

The Manns contend that the Act protects "consumers" as well as "purchasers," and therefore protects David.  Tri-Cities disagrees.  Although the parties frame this as a debate over standing, it is not.  Rather, this is a dispute over whether David's injury falls within "the class of plaintiffs whom [the D.C. Council] has authorized to sue under [the CPPA]."  See id. at 1387.  Whether David is within that class is determined by two inquiries: whether he is "within the zone of interests protected by [the CPPA]" and whether his injury is "proximately caused by violations of the statute."  Id. at 1388–90.

How demanding the zone of interests inquiry is depends on the nature of the statute.  Where, as here, the statute is designed to be broadly remedial, the test is "not especially demanding."  Id. at 1389 (internal quotation marks omitted); see D.C. Code § 28-3901(c) (the CPPA "shall be construed and applied liberally to promote its purpose"); id. § 28-3901(b)(1) (the CPPA's purpose is to "assure that a just mechanism exists to remedy all improper trade practices").  The proximate cause inquiry "bars suits for alleged harm that is too remote from the defendant's unlawful conduct."  Lexmark, 134 S. Ct. at 1390 (internal quotation marks omitted).  Although "not easy to define," it is a familiar concept: "The question it presents is whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits."  Id.

As with all statutory interpretation questions, the text is the first place to look.  Here, the text of the statute is clear.  Section 28-3905(k)(1)(A), which authorizes private plaintiffs to bring suits, states that "[a] consumer may bring an action seeking relief from the use of a trade practice in violation of a law of the district."  D.C. Code § 28-3905(k)(1)(A).  The "definitions" section states that "'consumer' means . . . a person who . . . does or would purchase, lease (as lessee) or

receive consumer goods or services . . . ." <u>Id.</u> § 28-3901(a)(2)(A). The Act's inclusion of both those who "purchase" and those who "receive" products and services within the definition of "consumer" makes it plain that a plaintiff need not actually pay for the services herself to claim the protections of the Act. The Court has no reason to infer that the use of the word "consumer" in § 28-3905(k)(1)(A) means something different how it is defined by the Act.

Moreover, the aim of the statute is to "establish[] an enforceable right to truthful information" in part that so consumers may make informed choices. <u>Id.</u> § 28-3901(c). David became a "consumer" of Tri-Cities services, rather than its competitors, because James allegedly received untruthful information about whether Tri-Cities was licensed in D.C. David's injuries therefore "have a sufficiently close connection to the conduct the statute prohibits." <u>Lexmark</u>, 134 S. Ct. at 1390. David is undoubtedly, then, within the zone of interests protected by the Act and his injuries were proximately caused by violations of the statute.

### B. The CPPA Creates A Cause of Action For False Information About Licensing Under The Nurse Staffing Agency Act

The Manns argue that Tri-Cities implicitly communicated that it was properly licensed in D.C. when it was not, and that this inaccurate representation is an unlawful trade practice under the CPPA. Tri-Cities responds that even if it did violate the Nurse Staffing Agency Act, the CPPA does not create a cause of action for violations of the Nurse Staffing Agency Act. Rather, Tri-Cities argues, the CPPA only creates a private right of action for violations of the acts enumerated in § 28-3904(y)–(gg). Both parties are only partially correct.

Section 28-3904 of the CPPA lists several unlawful trade practices, and identifies certain other D.C. laws for which any violation also constitutes an unlawful trade practice under the Act. Tri-Cities is correct that the Nurse Staffing Agency Act is not listed in subsections (y)–(gg) of the CPPA as an act for which any violation constitutes an unlawful trade practice. But it does not

follow that Tri-Cities' alleged misrepresentation of its licenses cannot be an unlawful trade practice.  Indeed, the text of the statute and D.C. case law indicate quite the contrary.

The text of the generally applicable subsections of § 28-3904 outline numerous ways that a merchant might mislead a consumer.  <u>See, e.g.</u>, <u>id.</u> § 28-3904(a) ("misrepresent that goods or services have a source, sponsorship, approval, certification . . . that they do not have"), (e) ("misrepresent as to a material fact which has a tendency to mislead").  Nothing in that text indicates that a merchant's misrepresentation of whether it complied with a licensing statute is <u>exempt</u> from these generally applicable descriptions of unlawful trade practices unless that licensing statute is also listed in subsections (y)–(gg).

The cases confirm this reading.  The D.C. Court of Appeals has explained that "[a]lthough § 28-3904 makes a host of consumer trade practices unlawful, its list of such practices was not designed to be exclusive."  <u>Atwater</u>, 566 A.2d at 466.  In particular, "the statute obviously contemplates that procedures and sanctions provided by the Act will be used to enforce trade practices made unlawful by other statutes" including those not listed in § 28-3904.  <u>Id.</u>  The court explained in <u>Atwater</u> that the legislative history further confirms that the CPPA "may be used even when other laws provide 'different enforcement procedures and mechanisms.'"  <u>Id.</u> at 467 (quoting Comm. on Public Servs. & Consumer Affairs, Report on Bill No. 1-253, Mar. 24, 1976, at 24).  Private plaintiffs, in addition to the enforcement agency, may likewise pursue this same breadth of unlawful trade practices.  <u>See</u> <u>Osbourne v. Capital City Mortg. Corp.</u>, 727 A.2d 322, 325 (D.C. 1999) ("[W]hile the CPPA is broad in the conduct it proscribes, even more important perhaps is the array of enforcement mechanisms it contains," including private civil actions).  Thus, even when considering private actions brought by consumers, "the CPPA's extensive enforcement mechanisms apply not only to the unlawful trade practices proscribed by § 28-3904, but to all other

statutory and common law prohibitions." Id. at 325–26. The plain text of the statute and the relevant D.C. case law confirm that a merchant that presents misleading information about its services in violation of another statute commits an unlawful trade practice, even if that statute is not specifically enumerated elsewhere in the CPPA.

The two cases Tri-Cities relies on do not support its argument to the contrary—in fact, they support the plaintiffs' case. Tri-Cities argues that Gomez v. Independent Management of Delaware, Inc., 967 A.2d 1276 (D.C. 2009), stands for the proposition that only the acts enumerated in § 28-3904 can be enforced through the CPPA. But that case holds no such thing. In Gomez, a tenant association claimed that the landlord corporation violated the CPPA because it violated the Rental Housing Conversion and Sale Act, which governs sales of certain tenant-occupied buildings. Id. at 1285. The D.C. Court of Appeals did hold that the defendant could not be liable for an unlawful trade practice under the CPPA for violating the Sale Act because that act was not enumerated in § 28-3904. Id. at 1286–88. But the court explained that this was because "landlord-tenant relations" are explicitly excluded from the CPPA; the only exception is certain real-estate transactions that are specifically enumerated in the Act, even though they might affect landlord-tenant relationships. See id. at 1286 nn.10 & 12 (explaining legislative changes to the CPPA to include "real estate transactions," although not landlord-tenant relations); D.C. Code § 28-3903(c)(2)(A) ("The Department may not . . . apply the provisions of section 28-3905 [outlining enforcement procedures] to . . . landlord-tenant relations."). Thus, Gomez provides no support for Tri-Cities' argument.

Tri-Cities also relies on Ihebereme v. Capital One, N.A., 933 F. Supp. 2d 86 (D.D.C. 2013), aff'd, 573 F. App'x 2 (D.C. Cir. 2014) (per curiam) (nonprecedential), for the same proposition— which Ihebereme, like Gomez, does not support. In Ihebereme, a homeowner sued his bank over

his mortgage. The homeowner alleged that the bank's communications with him and with credit reporting agencies, and the bank's failure to record the mortgage at the registry of deeds, were unlawful trade practices under the CPPA. Id. at 106–09. Several of the plaintiff's claims were preempted by federal law, but as to the claims that the bank's communications were misleading in violation of the CPPA, the court considered those on the merits and determined that the bank's communications were accurate. Id. at 107–08. The court then considered the plaintiff's separate claim that regardless of whether those communications were misleading, the bank's failure to record the mortgage violated a different D.C. law, and therefore violated the CPPA. Id. at 108–09. The court rejected that claim because the CPPA did not enumerate the recording statute as one for which any violation is an unlawful trade practice under the CPPA. Id. at 109. This, like Gomez, actually strengthens the Manns' argument rather than weakens it. The Manns here do not claim that violating the Nurse Staffing Agency Act is a per se violation of the CPPA, unlike Ihebereme's claim that violating the recording statute was a per se violation of the CPPA. Rather, they claim that Tri-Cities providing misleading information about whether it held the proper license, and that misleading information violated the generally applicable provisions of the CPPA.

Hence, the relevant precedent supports the plaintiffs' position: if Tri-Cities presented misleading or untruthful information about whether it was properly licensed in D.C. in any one of the various ways outlined in § 28-3904(a), (b), (d), (e), (e-1), (f), (f-1) or (s), then the Manns have a cause of action under the CPPA.

III. **Plaintiffs' Claims**

A. **The Nurse Staffing Act Applies to Tri-Cities**

A key premise of the Manns' CPPA claim is that Tri-Cities was required to obtain a license under the Nurse Staffing Agency Act and that it did not do so. Tri-Cities argues that the Nurse

14

Staffing Agency Act does not apply to referral agencies—like its registry service—and therefore any statement implying that it was fully licensed could not be an unlawful trade practice under the CPPA. This issue of D.C. law is a question of first impression. However, the Court concludes that the Nurse Staffing Agency Act does apply to referral agencies, and therefore Tri-Cities was required to obtain that license to operate in the District.

The Nurse Staffing Agency Act of 2003 states that "[a] nurse staffing agency shall be licensed by the Department [of Health] before providing or referring any nursing personnel . . . to a health care facility or agency, or to an individual[.]" D.C. Code § 44-1051.03. A "nurse staffing agency" is defined as "any person, firm, corporation, partnership or other business entity engaged in the business of providing or referring nursing personnel, to a health care facility or agency, or to an individual, for the purpose of rendering temporary nursing services within the District of Columbia." Id. § 44-1051.02(7). There are three explicit exceptions. A nurse staffing agency "does not include . . . [a] nurse staffing program operated by a health care facility solely for the purpose of" providing nursing personnel at that facility; "[a]n entity operating solely as a home care agency"; or "[a]ny nursing personnel providing or referring their own services . . . without the direct or indirect assistance of a nurse staffing agency." Id. § 44-1051.02(7)(A)–(C). The D.C. Department of Health issues regulations implementing the Nurse Staffing Agency Act. See generally D.C. Mun. Regs. subt. 22-B, §§ 4900–99. These include a variety of standards designed to protect health and safety. For example, a nurse staffing agency must adopt specific procedures for documenting and investigating complaints against its personnel and for reporting certain incidents to the Department. See id. §§ 4905, 4999. Additionally, "[a]ll nursing personnel and health aides . . . must be employees of the nurse staffing agency." Id. § 4904.1. Complying with this requirement is, of course, incompatible with Tri-Cities' business model for its registry service.

It is undisputed that Tri-Cities does not hold a nurse staffing agency license from the D.C. Department of Health.  See Pls.' Stmt. of Undisputed Facts ¶ 4; Answer ¶¶ 109–10.  Likewise, it is undisputed that Tri-Cities is a "business entity engaged in the business of . . . referring nursing personnel . . . to an individual[] for the purpose of rendering temporary nursing services within the District of Columbia."  See D.C. Code § 44-1051.02(7).  It thus appears from the text that Tri-Cities' registry service falls within the terms of the Nurse Staffing Agency Act.

Tri-Cities, however, argues that the Nurse Staffing Agency Act does not apply at all.  It argues that if the Act applied to Tri-Cities' registry service, that would effectively outlaw this business model—which would be an absurd result.  The D.C. council and Department of Health could not have intended to deprive D.C. residents of the valuable service that a registry, rather than an agency that employs it nurses, provides.  The Act is better construed, the argument goes, as regulating agencies that directly employ nurses (rather than referring nurses) and only provide care in a health care facility.  In support of this argument, Tri-Cities points to the text of the Act, and argues that the registry does not "render[] temporary nursing services," rather, it only refers clients to licensed professionals who render those services.  Tri-Cities also points to the Nurse Staffing Agency Act's legislative history—specifically testimony provided to the D.C. Council in support of the Act that emphasizes that the Act is geared towards nursing care in a facility-based context. See D.C. Comm. Rep., B.15-123 (June 13, 2003).  Finally, Tri-Cities argues that applying the Nurse Staffing Agency Act's requirements to an agency that provides in-home care would eliminate the distinction between Nurse Staffing Agencies and Home Care Agencies.

Although not frivolous, none of Tri-Cities' arguments are consistent with the plain text of the statute.  The Act itself explicitly includes businesses that refer (rather than only provide) nursing personnel, whether to a facility or an individual.  Indeed, as the Act explicitly states, a

"nurse staffing agency" is "any . . . business entity engaged in the business of providing or <u>referring</u> nursing personnel, to a health care facility or agency, or <u>to an individual</u>."  D.C. Code § 44-1051.02(7) (emphasis added).  Nor does the Act include any limitation on the setting in which an individual might hire personnel through a nurse staffing agency—a client might use a nursing agency to provide for private nursing care in a health care facility or in his or her home, just as David Mann did here.  Thus there is simply no support in the Act's text for Tri-Cities' argument that the Act itself excludes referrals or excludes agencies that provide care to individuals (in any setting) directly rather than to health care facilities.

The legislative history likewise provides scant support for Tri-Cities' position.  The Committee Report includes summaries of comments from the public and officials at the Department of Health.  Two of the comments do reflect the assumption that the Act will regulate agencies that provide personnel to health care facilities; but another comment emphasizes the value of the act in regulating agencies that provide personnel to "health care facilities and individual patients."  <u>Compare</u> D.C. Comm. Rep., B. 15-123 at 5 (Statement of Denise Pope, Dept. of Health) (emphasizing facilities) <u>and</u> <u>id.</u> (Statement of Karen V. Scipio-Skinner, Dept. of Health) (emphasizing facilities) <u>with</u> <u>id.</u> (Statement of Robert Malson, D.C. Hospital Assoc.) (mentioning both facilities and individuals).  One could conclude from this history that the D.C. Council anticipated that it would be more common for nurse staffing agencies to provide or refer nurses to health care facilities rather than to individuals.  But regardless, while these statements might shed some light on the meaning of the statutory text, they cannot contradict the text.  And the text, by its terms, applies to agencies that refer nursing personnel to an individual.  <u>See</u> D.C. Code § 44-1051.02(7).  Nor does the text place any limitation on whether that individual would be receiving nursing care in a home setting, or a different setting.  The legislative history, then, does not

persuade the Court to adopt Tri-Cities' argument that the Nurse Staffing Agencies Act only applies to agencies providing, rather than referring, nursing personnel to health care facilities, rather than individual homes.

Tri-Cities' argument regarding home care agencies is more persuasive, but ultimately unavailing. The D.C. Council is "presumed to have acted rationally and reasonably," and thus "courts eschew interpretations that lead to unreasonable results, that create obvious injustice, or that produce results at a variance with the policies intended to be furthered by the legislation." In re C.L.M., 766 A.2d 992, 996 (D.C. 2001) (internal citations omitted). To interpret two statutes in a manner that would render one nonsensical or superfluous would be inappropriate. This is especially true here, where the Nurse Staffing Agency Act creates a specific exception for home care agencies, indicating that the D.C. Council considered and specifically determined how these statutes would interact. The Health-Care and Community Residence Facility, Hospice and Home Care Licensure Act of 1983 (Home Care Act) establishes licensing requirements for a variety of health care entities. It defines a "home care agency" as "an agency, organization, or distinct part thereof . . . that directly provides skilled nursing services and at least one other therapeutic service to an individual, in his or her home or in a community residence facility, who is sick or who has a disability." D.C. Code § 44-501(a)(7). A "community residence facility" is "a facility that provides a sheltered living environment for individuals who desire or need such an environment because of their physical, mental, familial, social, or other circumstances and who are not in the custody of the Department of Corrections." Id. § 44-501(a)(4).

Tri-Cities argues that if the Nurse Staffing Agency Act applies to agencies that refer nursing personnel to individuals for care within those persons' homes, then it essentially requires all such agencies to be licensed under both the Nurse Staffing Agency Act and the Home Care

Act—which would contradict the express text of the Nurse Staffing Agency Act's exception for home care agencies. But the text in question actually resolves this problem. By its terms, the Nurse Staffing Agency Act states that "[t]he term 'nurse staffing agency' does not include . . . [a]n entity operating <u>solely</u> as a home care agency, as defined by § 44-501(a)(7)." <u>Id.</u> § 44-1051.02(7)(B) (emphasis added). The implication is clear: an entity that provides nursing care to an individual <u>only</u> in his or her home may obtain a home care agency license without needing to obtain a nurse staffing agency license. But an entity—like Tri-Cities—that provides nurses to individuals whether the client is in a facility or in his or her own home must obtain both a nurse staffing agency license and a home care agency license, if it meets the criteria for both of those acts.[2] <u>Cf.</u> J. Mann Dec. ¶¶ 12–13 (Tri-Cities referred nurses to care for David both in a rehabilitation facility and at his home). Interpreting the two statutes in a manner that would require certain entities to obtain both licenses in the above-described scenario is entirely consistent with the Nurse Staffing Agency Act's limited exception for certain home care agencies (i.e., those that <u>only</u> provide in-home care). Thus, § 44-1051.02(7) does not support Tri-Cities' theory that the Nurse Staffing Agency Act applies only to agencies that provide nurses for health care facilities.

Hence, based on the undisputed facts, Tri-Cities was required to obtain a nurse staffing agency license for its registry service and it did not so do. The Court acknowledges that reading the Nurse Staffing Agency Act in this manner functionally means a true registry service—one that refers independent contractor nurses to clients—cannot operate in D.C. Whether that is a desirable outcome is for the D.C. Council or Department of Health to determine, and to address through legislation or regulation if appropriate.

---

[2] Although the Manns note in a footnote that Tri-Cities does not hold a home care agency license, neither party has squarely raised or briefed the issue of whether it was required to obtain one, whether it does in fact hold such a license, and whether any lack of a home care agency license could constitute an unlawful trade practice under the CPPA. The Court expresses no view on those issues.

### A. Whether Tri-Cities' Statements Were Unlawful Trade Practices Is a Factual Question

There is no dispute regarding the information that Tri-Cities conveyed to James Mann: Tri-Cities stated that it was licensed in Maryland, but it referred nurses to David at locations in D.C. The question instead is whether offering services in D.C., or offering services in D.C. while publicizing its Maryland licenses, implicitly communicated that Tri-Cities held the required license in D.C. The Manns argue that it does, and therefore Tri-Cities violated various subsections of the CPPA. Subsections (a), (b), (d), and (e-1) prohibit representing that the goods, services, or persons, have certain qualities that they do not possess. D.C. Code § 28-3904(a), (b), (d), (e-1). Subsection (s) forbids "pass[ing] off goods or services as those of another." Id. § 28-3904(s). And subsections (e), (f), and (f-1) prohibit representations or omissions "as to a material fact" when those representations or omissions have "a tendency to mislead." Id. § 28-3904(e), (f), (f-1).

A court must "consider an alleged unfair practice 'in terms of how the practice would be viewed and understood by a reasonable consumer.'" Saucier v. Countrywide Home Loans, 64 A.3d 428, 442 (D.C. 2013) (quoting Pearson v. Chung, 961 A.2d 1067, 1075 (D.C. 2008)). How the practice would be viewed by a reasonable consumer is generally a question for the jury. See, e.g., id.; Pearson, 961 A.2d at 1075 (interpretation of "satisfaction guaranteed" sign was a factual question). But there are times when it is sufficiently clear to be determined as a matter of law. See, e.g., Alicke v. MCI Commc'ns Corp., 111 F.3d 909, 912 (D.C. Cir. 1997) (determining that no reasonable person could interpret consumer phone contract in the manner the plaintiff asserted).

For the claims under subsections (e), (f), and (f-1), a statement or "omission is material if a significant number of unsophisticated consumers would find that information important in determining a course of action." Saucier, 64 A.3d at 442 (quoting Green v. H&R Block, Inc., 735 A.2d 1039, 1059 (Md. 1999)) (adopting standing from Maryland law because D.C. "look[s] to

Maryland law as instructive"); see also Golt v. Phillips, 517 A.2d 328, 332 (Md. 1986) (articulating the same test). And there, too, "[o]rdinarily, the question of materiality should not be treated as a matter of law." Id. (quoting Green, 735 A.3d at 1059). Although, of course, there are again exceptions. For example, in Golt v. Phillips, the Maryland Court of Appeals determined that advertising an apartment for rent necessarily implied that the apartment was properly licensed, and that this fact is material to a tenant as a matter of law. See Golt, 517 A.2d at 332–33.

Whether information "has a tendency to mislead" is also based on the "reasonable consumer" standard, and is therefore usually a question of fact. See Saucier, 64 A.3d at 442. Although a reasonable consumer generally would not deem an accurate statement to be misleading, see, e.g., Whiting v. AARP, 701 F. Supp. 2d 21, 29 (D.D.C. 2010), in certain circumstances it can be, see, e.g., Golt, 517 A.2d 332.

Here, the Court concludes that, for all of plaintiffs' claims under § 28-3904, whether Tri-Cities' statements implied that it was licensed in D.C. is a question of fact for a jury. A reasonable juror might find that by offering its services in D.C., Tri-Cities implied that it held the necessary D.C. licenses. However, a reasonable juror might find instead that by identifying certain licenses that it did hold, Tri-Cities did not give an inaccurate impression as to whether it held a nurse staffing agency license in D.C. Similarly, for claims under subsections (e), (f), and (f-1), whether Tri-Cities' misrepresentations or omissions (if any) pertained to material facts and had a tendency to mislead are also questions for a jury. The Court therefore will deny both motions for summary judgment, and let this factual question be determined by a jury.

## IV.    **Damages**

The parties present different legal theories for the proper method of calculating damages. Because there is not yet any determination of liability, the Court will reserve judgment on the

proper calculation of damages at this time. The parties may renew their motions for summary judgment on this issue when appropriate, or address this question through proposed jury instructions.

## **CONCLUSION**

For the reasons explained above, the plaintiffs' motion for partial summary, and the defendant's cross-motion for partial summary judgment, will both be denied. A separate order has been issued on this date.


_____/s/_____
JOHN D. BATES
United States District Judge

Dated: <u>April 27, 2017</u>